462 F.2d 224
 UNITED STATES of America, Plaintiff-Appellee,
v.
Tom O'DELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Arlie MURR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
D. C. RAMSEY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Junior HICKS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Glen SHOEMAKER, Defendant-Appellant.
 Nos. 71-1606 to 71-1610.
 United States Court of Appeals,
 Sixth Circuit.
 June 16, 1972.
 
 Dale Quillen, Nashville, Tenn. (Court-appointed), for appellants Arlie Murr, D. C. Ramsey, Junior Hicks and Glen Shoemaker.
 John F. Dugger, Ben W. Hooper, II, Newport, Tenn., on brief, for appellant O'Dell.
 W. Thomas Dillard, Jerry Foster, Chattanooga, Tenn., John L. Bowers, Jr., U. S. Atty. (Eastern Dist. of Tenn.), Carl P. McDonald, Asst. U. S. Atty., Knoxville, Tenn., Jerry Foster, Asst. U. S. Atty., Chattanooga, Tenn., on brief, for appellee.
 Before CELEBREZZE and PECK, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.
 CELEBREZZE, Circuit Judge.
 
 
 1
 In an indictment handed up in August, 1970, a federal grand jury charged seven Cocke County, Tennessee law enforcement officials,[1] a private bail bondsman and "other persons to the Grand Jury unknown" with participation in a scheme designed to pervert the workings of justice in Cocke County and to make the criminal law of Tennessee a source of personal gain for those who administered it. The net effect of such scheme, according to the indictment, was to coerce and intimidate inhabitants and citizens of the United States in the exercise of rights guaranteed by the Constitution.
 
 
 2
 The indictment alleged that over a period of months, constables and deputy sheriffs of Cocke County arrested a number of persons as they drove away from local taverns, charging them with drunk driving or driving while intoxicated.1a Once placed in the County jail the prisoners were not taken before a magistrate. Instead they were told that they faced an unenviable choice: make "bail" in amounts ranging up to $350.00 or be sentenced to "11 months and 29 days on the road." It was allegedly explained to the prisonervictims-all of whom resided outside of Cocke County-that whatever conventional notions of bail might be, in Cocke County one paid over the money, departed without a receipt and did not return-for trial or otherwise. It was alleged that the prisoners consistently chose the less onerous of the alternatives, scraped together the "bail" money with the aid of relatives, and departed. Thereafter, upon motion of the arresting officer, charges against them were dropped.
 
 
 3
 Upon the return of the federal indictment setting forth this scheme the law enforcement officials and others alleged to have assisted them were brought to trial in the United States District Court for the Eastern District of Tennessee.
 
 
 4
 After a lengthy jury trial, five defendants-all law enforcement officials-were found guilty of the offenses with which they were charged. Four, Arlie Murr, D. C. Ramsey, Junior Hicks and Glen Shoemaker were convicted of "will-fully depriving" persons of their constitutionally guaranteed rights in violation of Title 18 U.S.C. Sec. 242. The fifth, Tom O'Dell was convicted of conspiring to "injure, oppress, threaten or intimidate" citizens in the exercise of such rights in violation of 18 U.S.C. Sec. 241. All five defendants have taken appeals to this Court.
 
 
 5
 All the Appellants suggest that they were entitled to directed verdicts of acquittal because the proof offered at their trial failed to establish the facts alleged in the indictment. Appellant O'Dell also urges that his trial and conviction were improper, constituting such double jeopardy as is prohibited by the Fifth Amendment. All Appellants join in raising numerous other allegations of error in the conduct of their trial which, they argue, entitle them to reversal of their convictions and new trials. We believe that Appellant O'Dell's double jeopardy plea was properly rejected.[2] We also believe that the evidence introduced at trial would have been sufficient to support the guilty verdicts had the jury been properly instructed. However, in light of the error committed by the trial court in instructing the jury and the likelihood of prejudice resulting from that error we conclude that the Appellants are entitled to new trials.
 
 
 6
 18 U.S.C. Sec. 241 provides in relevant part:
 
 
 7
 "If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; . . .
 
 
 8
 They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; . . . ."
 
 
 9
 18 U.S.C. Sec. 242 provides in relevant part:
 
 
 10
 "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both. . . ."
 
 
 11
 It is apparent from the bare statutory language that in any prosecution for violation of 18 U.S.C. Sec. 242 a central question facing the trier of fact will be whether a right protected by the Constitution or federal laws has been plotted against or taken from a citizen or inhabitant of one of the United States. In answering this question, it is, of course, essential that the trier of fact have before it a clear conception of what rights are so protected.
 
 
 12
 The District Court recognized this need and carefully informed the jury:
 
 
 13
 "As to both of these statutes, ladies and gentlemen one of the rights and privileges secured to every citizen of this country, and protected by its Constitution is the right to due process of law; and, it is his immunity under that Constitution not to be deprived of his liberty or his property, including money, by a state without due process of law."
 
 
 14
 The Court then went on to define the "right" in question:
 
 
 15
 "No hard and fast rule can be laid down as to what is, and what is not, due process of law; but for your purposes, due process of law is that process which is due a person who is charged with driving a motor vehicle while under the influence of an intoxicant or some other charge, according to the law of Tennessee." (emphasis supplied).
 
 
 16
 The Court expanded on the definition, referring to the protected right throughout as, "due process of Tennessee law." Seeking to clarify the phrase, the District Judge set forth in great detail (and over the objections of defense counsel) the Tennessee rules governing arrest, the setting and receiving of bail, commitment to jail and release of arrested persons. Included in his descriptions were such procedural rules as those requiring: that an arrested person be taken before a magistrate promptly; that an arrested person be allowed to make one phone call before being booked; that the court clerk and not a law enforcement officer take custody of any driver's license confiscated from one accused of driving while intoxicated; and that the maximum bail set for a person accused of the latter offense not exceed $200.00.
 
 
 17
 Having listed these and other procedural requirements of the Tennessee laws the District Court concluded this section of its charge by instructing the jury:
 
 
 18
 "Due process of law guarantees that each and every citizen of the United States, who finds himself charged by an officer of the State of Tennessee with the offense of driving while intoxicated will receive the full and equal protection of the aforementioned laws at each stage of the proceedings against him.
 
 
 19
 "In regard to each respective charge against these respective defendants, if you find from all of the evidence beyond a reasonable doubt that a respective defendant denied the United States citizen his right to such due process of law, then you will find such respective defendant had subjected such a citizen to a deprivation of a right, privilege and immunity secured to him by the Constitution of the United States of America."[3]
 
 
 20
 Simply put, the instructions informed the jury that the State of Tennessee had established certain rules concerning criminal procedure, that these rules each protected an element of the due process of law which is guaranteed to arrested persons, and that willful violations of these rules would constitute that deprivation of Constitutionally guaranteed rights which is made criminally punishable by 18 U.S.C. Sec. 242.[4] Similarly, the instructions informed the jury that a conspiracy to violate such Tennessee rules would violate 18 U.S.C. Sec. 241.[5]
 
 
 21
 We believe these instructions reflect an improper view of the relevant principles of law.
 
 
 22
 The origins of the District Court's erroneous instructions likely can be traced to an apparent confusion between that due process which is guaranteed by the federal Constitution and "due process of Tennessee law" which, insofar as it is not identical with federal due process, is not directly guaranteed by the Constitution. 18 U.S.C. Secs. 241 and 242 are concerned only with deprivations of rights guaranteed by federal law or the Constitution. See Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).
 
 
 23
 It is clear that the mere fact that a state rule has been willfully violated or that a conspiracy has been formed to violate such rule, does not itself give rise to criminal liability under 18 U.S.C. Secs. 241 or 242.[6] This principle was recognized in Screws, supra:
 
 
 24
 "The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under 'color of any law' * * * The statute [18 U.S.C. Sec. 241] does not come into play merely because * * * the state law under which the officer purports to act is violated. It is applicable when and only when someone is deprived of a federal right by that action." 325 U.S. 91, 108, 65 S.Ct. 1031, 1038 (1945) (emphasis supplied)
 
 
 25
 Conceivably in a given case the state law rules may happen to coincide with the requirements of federal due process. In such a situation, while theoretically unsound, a charge to the jury couched initially in terms of state law violations might not constitute serious error. Here, however, many of the state rules whose violation was brought into question are not rules required by the due process clause of the Constitution.
 
 
 26
 Before a defendant can be convicted of a violation of 18 U.S.C. Sec. 242 it must be shown that he intentionally
 
 
 27
 deprive[d] a person of a right which had been made specific by the express terms of the Constitution or laws of the United States or by decisions interpreting them. Screws v. United States, 325 U.S. 91, 104, 65 S.Ct. 1031, 89 L.Ed.2d 1495; United States v. Ragsdale, 438 F.2d 21, 25 (5th Cir. 1971), cert. denied 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696 (1971).
 
 
 28
 Applying this rule here we are compelled to conclude that the right to be taken before a magistrate promptly after arrest by state authorities is not one which has as yet been held to be guaranteed to persons by the Constitution with the specificity required by Screws. See Anderson v. Nosser, 438 F.2d 183, 196 (5th Cir. 1971), modified on other grounds (en banc) (March 3, 1972). Similarly, while many federal courts have begun to view the right to bail as one guaranteed by the Constitution even in state criminal cases (see United States ex rel. Keating v. Bensinger, 322 F.Supp. 784 (N. D.Ill.1971) and cases cited therein at 786 n. 3) we cannot say that this approach has won such uniform adoption as to meet the test of Screws and thus provide the basis for a prosecution under 18 U.S.C. Sec. 241 or Sec. 242.[7] Even were the right to non-excessive bail guaranteed there is certainly no court decision suggesting that the $200.00 limit which Tennessee assertedly placed on bail costs in connection with driving while intoxicated charges,[8] provides the cutoff figure beyond which all bail costs are "excessive" and in violation of the Constitution. No decision of any court has defined the due process guaranteed by the United States Constitution so as to include a guarantee that any person accused of a crime by state officers be permitted to make a phone call before being booked. Nor has any decision held such due process to require that a court clerk rather than an arresting officer hold a driver's license confiscated by police after the arrest of an individual on driving while intoxicated charges. Yet the District Judge informed the jury that each of these "rights" granted an individual by Tennessee state law is protected by due process and willful violation of such rights is punishable under the federal criminal laws. It is apparent that he was in error.[9]
 
 
 29
 The actions of which Appellants were accused could, of course, have been violative of a specific Constitutional right made sufficiently definite to satisfy the requirements of Screws and therefore to give rise to criminal liability under 18 U.S.C. Secs. 241 or 242.
 
 
 30
 It is well established that persons arrested by state law enforcement officials and charged with a crime are entitled to a trial to resolve the question of guilt; this right is one of those guaranteed by the due process clause of the Fourteenth Amendment. United States v. Price, 383 U.S. 787, 799, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Williams v. United States, 341 U.S. 97, 101, 71 S. Ct. 576, 95 L.Ed. 774 (1951). A willful effort to deprive a citizen of such right, or to intimidate him in its exercise, if mounted under color of state law, violates 18 U.S.C. Sec. 242. A conspiracy to effect such ends, whether directed against citizens or mere inhabitants of the United States, is punishable under 18 U.S.C. Sec. 241. See United States v. Price; United States v. Williams, supra; Brown v. United States, 204 F.2d 247 (6th Cir. 1953); Culp v. United States, 131 F.2d 93 (8th Cir. 1942); cf. United States v. Ragsdale, 438 F.2d 21 (5th Cir. 1971), cert. denied 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696 (1971).
 
 
 31
 Thus the District Judge might properly have informed the jury that the specific actions involved in violating the state rules could provide evidence of an effort to deprive persons of their Constitutionally guaranteed rights to a fair trial. He might even have informed them that the very violations themselves could provide some evidence of a specific intent to deprive persons of such rights or to intimidate persons in the exercise of such rights.
 
 
 32
 The District Court never mentioned the right to trial, however, or any other right specifically protected by the due process clause. Thus, while the jury was correctly told that it had to determine whether a person's due process rights were violated or conspired against by Appellants, it was never informed as to the contents of that "due process guarantee." The jurors thus were asked to reach a verdict without an understanding of one of the essential elements of the crime with which Appellants were charged.
 
 
 33
 The federal appellate courts will not reverse a criminal conviction for errors in the conduct of a trial which are merely formal in nature and which prejudice no substantial rights of the defendant. Rule 52(a), Federal Rules of Criminal Procedure. This rule has been applied frequently where erroneous instructions have been given to the jury, but where the error was, in the context of the entire case, harmless. See Ryan v. United States, 278 F.2d 836 (9th Cir. 1960). Our inquiry must then be directed to the question of whether the error in question here was harmless and affected only insubstantial rights, or whether it was an error of more consequence.
 
 
 34
 Generally the failure of a District Judge to set forth clearly one of the essential elements of an offense creates such a significant flaw in the trial process as to require reversal of any convictions obtained for the offense involved. See Byrd v. United States, 342 F.2d 939 (D.C.Cir. 1965); Jackson v. United States, 348 F.2d 772 (D.C. Cir. 1965); United States v. Harris, 346 F. 2d 182 (4th Cir. 1965); cf. Lott v. United States, 218 F.2d 675 (5th Cir. 1955); United States v. Gaither, 440 F.2d 262 (D.C.Cir. 1971).
 
 
 35
 Here the problem is not merely that the Court's instructions failed to provide guidance for the jury's deliberations, but rather that the instructions may well have misled the jurors. Strong evidence was introduced at trial indicating that the Appellants violated one or more of the state procedural rules mentioned by the District Judge in defining "due process of Tennessee law." For example, it appeared from testimony that confiscated drivers' licenses were held by arresting officers rather than filed with the local court clerk on a number of occasions; improper delays were allowed in the arraignment effort-apparently in part as a result of actions or inaction by some of the Appellants; bail in excess of the $200.00 maximum figure mentioned by the District Judge was set and accepted. The jury might well have found that Appellants did, intentionally, act contrary to the state rules in dealing with the arrest and confinement of persons charged with driving while intoxicated. Dutifully following the District Judge's instructions, the jurymen would then have been able to conclude, without any further findings or deliberations, that the federal criminal statutes under which Appellants had been charged, were in fact violated by Appellants' conduct. Such conclusion would have been unwarranted, absent further deliberations, however.
 
 
 36
 Several key elements of the offense would not yet have been found to be present. With respect to the Sec. 242 violation the jury had yet to determine whether the individual actions of the Appellants in any way operated to deprive a person of a Constitutionally protected right. Similarly it had yet to determine whether, if such effect did result from Appellants' actions, these actions were undertaken with a specific intent to bring about such result.[10] We cannot fairly assume the jury reached these questions since they were never correctly told the nature of the Constitutionally guaranteed rights which had to be the starting point of their inquiry. Similar problems exist of course with respect to the Sec. 241 conviction of Appellant O'Dell. Again we cannot assume that the jury found him to be a member of a conspiracy which sought to threaten or intimidate citizens in the exercise of protected rights, for once more the jury had not been told what rights were and were not protected by the Constitution.
 
 
 37
 Despite the strength of the government's cases against Appellants we cannot say with assurance that a properly instructed jury would necessarily have returned the guilty verdicts in question here. Any of the individual actions previously discussed-the delay in bringing an accused before a magistrate, for instance-could well have been undertaken independent of any effort to deprive a person of Constitutional rights or of any conspiracy to accomplish such results. The delay in arraignment, for example, even if it resulted from intentional conduct may have been the product of sheer laziness on the part of an arresting officer, an unwillingness to inconvenience himself or the local magistrate simply to accord an arrested person his state granted rights. Such conduct is reprehensible, perhaps even a state criminal offense-but not a federal crime. The act becomes a violation of Section 242 only if undertaken as part of an intentional and effective effort to deprive an individual of his right to trial or other federal right. The jury was never asked which of these two scenarios comported with reality in connection with the denial of prompt arraignment or the other specific acts with which Appellants were accused. Similarly the jurors were not asked to distinguish between a conspiracy designed to achieve goals violative of state law and one which sought to affect persons in the exercise of specific federal rights. Only the latter course of conduct is punishable under Sec. 241.
 
 
 38
 Under such circumstances, following the Supreme Court's rule that we must look to "[the] effect the error had or reasonably may be taken to have had upon the jury's decision" Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) we cannot say that the error in the jury instructions was either harmless or insubstantial.
 
 
 39
 We have suggested earlier that substantial evidence of both a conspiracy and an actual effort to deprive persons of Constitutional rights exists in the record which has come before us. The existence of such substantial evidence is irrelevant here, however. "The question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts." Bollenbach v. United States, 326 U.S. 607, 614, 66 S.Ct. 402, 90 L.Ed. 350 (1946); cf. United States v. Casale Car Leasing, Inc., 385 F.2d 707 (2d Cir. 1967).
 
 
 40
 Appellants have been primarily accused of denying criminally accused persons the right to a trial on the charges placed against them. We must take every care, lest, acting to deter misuse of official power, federal law enforcement officials and the federal courts deny Appellants their right to a fair trial.
 
 
 41
 The error committed by the District Court in instructing the jury requires that the judgments be vacated and the causes remanded to the District Court for new trials.[11]
 
 
 
 [1]
 An eighth law enforcement official, Deputy Sheriff Rufus Leatherwood, was named a co-conspirator by the grand jury, but not indicted
 1a The indictment did not allege that the arrests were made without probable cause.
 
 
 [2]
 O'Dell was previously acquitted of charges that he joined in a conspiracy to deprive persons of their civil rights. Though involving the same time period and a similar extortion scheme the earlier charges (Indictment # 7167) differed substantially from the present ones in the identity of both O'Dell's alleged co-conspirators and the victims of the asserted plots
 O'Dell contends that the Government improperly separated one conspiracy into two to increase its chances of successful prosecution. Had he been able to establish that but a single overall conspiracy existed we would be compelled to uphold his former jeopardy claim. United States v. Cohen, 197 F.2d 26 (3d Cir. 1952); United States v. Palermo, 410 F.2d 468 (7th Cir. 1969).
 O'Dell had the burden of showing the unified nature of the conspiracy. Sanchez v. United States, 341 F.2d 225 (9th Cir. 1965), cert. denied 382 U.S. 856, 86 S.Ct. 109, 15 L.Ed.2d 94 (1965); Rothaus v. United States, 319 F.2d 528 (5th Cir. 1963). He has not met that burden.
 The District Court held that the total dissimilarity of the alleged victims of the two plots alone required a finding that two conspiracies existed. While this view has support (see United States v. Brimsdon, 23 F.Supp. 510 [W.D.Mo.1938]) we are reluctant to base our entire decision on it, given the fact that the conspiracy may well have been aimed not at any specific individuals, but at a broad class of persons arguably composed of victims named in both indictments. We therefore rely also on the difference in the identity of the alleged conspirators and the difference in their official positions. While the group in # 7167 was primarily composed of state highway patrolmen, that named in the present indictment was composed entirely of local policemen. In the absence of any evidence that the two distinct groups worked together toward a common goal, rather than merely following parallel plans built around the central figures-O'Dell and Leatherwood-we do not find any reason to view the two plots as part of a single unified conspiracy.
 In light of this holding with respect to the existence of two separate and distinct conspiracies and in the absence of any indication whatever that the overt acts involved in the two conspiracies were identical in time, place or participants, we also find O'Dell's claim of collateral estoppel without merit.
 
 
 [3]
 These last quoted paragraphs clearly pertain most directly to the offense set out in Sec. 242 of Title 18. Since the District Court did not elsewhere relate the nature of the protected rights to the conspiracy offense set forth in Sec. 241 of that Title, it must be assumed that it intended to inform the jury that one who conspired to deprive a citizen of any of "the aforementioned laws at [any] stage of the proceedings against him" would have "conspired to injure, oppress, threaten, or intimidate" him in the free exercise of a right or privilege secured to him by the Constitution
 
 
 [4]
 Elsewhere in its charge the District Court informed the jury that:
 "in every crime. . . . there must exist a union or joint operation, of act on the one hand, and intent on the other, and the burden is always on the prosecution to have proved not only what was done, but also the intent with which it was done, beyond a reasonable doubt. "Specific intent must be proved before there can be a conviction. . . . A person who knowingly does an act which the law forbids, intending with evil motive or bad purpose, either to disobey or disregard the law may properly be found to have acted with specific intent. . . . (Y)ou may draw the inference that each of these defendants intended all of the consequences resulting from any act which he knowingly did, or did not do that anyone standing in like circumstances and possessing similar knowledge, should have reasonably expected to have followed."
 Thus it followed from the instructions that the jury could find a defendant intended to deprive a person of a guaranteed right if such deprivation was the natural consequences of his action. Before the jury could properly draw any conclusion as to what the natural consequences of any action was in terms of rights affected, however, it would have to be informed of what those rights were. The text of the remainder of this opinion addresses itself to the question of whether the jury was so informed.
 
 
 [5]
 That the District Judge himself understood the state rules to be identical with the due process guaranteed by the United States Constitution was made evident when, out of the presence of the jury, he ruled upon exceptions and objections to the charges in question
 MR. DUGGER (one of several defense attorneys): [I object to] The Court's charge in which the Court charged the jury that it is due process of Tennessee law to require a bondsman to keep a duplicate copy and that it is a violation of Tennessee law for him not to keep a duplicate copy, that may be a regulation of Tennessee law, but it has nothing to do with due process of law granted to these people under the Fourteenth Amendment.
 THE COURT: Well, the Court believes that any statutory requirement as to procedure is a matter of due process of law. Give me just a moment and I will give you the section in which that is required. It is T.C.A., Section 40-1404 et seq.
 While the specific objection in question related to a defendant subsequently acquitted, the judge's belief that state procedural rules and federal due process are one and the same is readily apparent in his remarks. This equation of the two is emphasized later in the same colloquy.
 MR. DUGGER: The defendants object to the Court's charge that due process of law is what is due a person according to the laws of Tennessee.
 THE COURT: Objection overruled. That is what due process of law was in this case.
 MR. DUGGER: I object to the Court's charge that due process of Tennessee law requires a-due process of Tennessee requires a driver's license to be deposited with the criminal or circuit court, and also setting out various duties of the clerk of the court.
 THE COURT: That is what is required by the applicable statute. If you will give me just a minute I will give that to you. T.C.A., Section 59-713. Objection overruled.
 
 
 [6]
 The Government's theory of the case, as presented below, revolved around due process violations only. The indictment mentioned only such due process violations. The Government did not claim that any person's equal protection rights had been abridged and therefore did not introduce evidence to support such claim. Equal protection rights are protected by the criminal civil rights statutes, however. See United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1965). Conceivably violations of the state statutes might have been relevant in showing unequal enforcements of the laws-but proof was not developed on this point-the Government relying instead on due process claims. The Government's attempt to invoke equal protection principles now to justify emphasis on state law must fail since the case was not tried on such theory
 
 
 [7]
 The Screws test of course eliminates the possibility that persons may be prosecuted for willful violation of "emerging" Constitutional rights. While lessening the scope of civil rights protection available to citizens, such limitation is necessary if the criminal civil rights statutes are themselves to avoid characterization as unduly vague and indefinite. See Screws, supra
 
 
 [8]
 The prejudicial effect of the instructions relevant to this point was increased by the fact that the Judge erred in declaring $200.00 to be the maximum bail allowed by Tennessee law. It appears Chapter 360 of the Public Acts of 1967 amended Tennessee Code Sec. 40-118 to provide for a maximum bail figure of $750.00 for driving while under the influence in Cocke County. This law was in effect during the period charged in the indictment although it was later repealed
 The jury could have rejected defense claims that drivers were merely being charged permissible bail when they paid up to $350.00 for release on the basis of the incorrect bail maximum suggested by the District Judge. This fact alone suggests that the instructions geared to violation of individual state rules may well have been prejudicial to one or more of the defendants.
 
 
 [9]
 The Government argues that since the state law violations could be taken as some evidence of an intent to deprive citizens of their civil rights, the District Court might properly instruct the jury as to the nature of those state laws. This is true as far as it goes. However, the District Judge did not limit the relevance of state law to such evidentiary purposes; on the contrary he suggested to the jury that the state law provided the standard for determining what rights were protected by the federal statutes in question. As we indicate above, this was clear error
 
 
 [10]
 In determining whether such specific intent existed, the jury in any new trial need not, in order to convict, determine that Appellants actually knew that it was a Constitutional right that they were violating or conspiring against. As the Supreme Court said in Screws, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495:
 "The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce a local law but to deprive a citizen of a right and that right was protected by the Constitution." 325 U.S. 91, 106, 65 S.Ct. 1031, 1037.
 It is enough if Appellants can be shown to have acted in a manner which was "in reckless disregard of constitutional prohibitions or guarantees."
 Speaking specifically of the intent needed to prove that a defendant has deprived a person of Constitutional rights by denying him a trial the Supreme Court has said:
 "Those who decide to take the law into their own hands and act as prosecutor, jury, judge and executioner plainly act to deprive a prisoner of the trial which due process of law guarantees him. And such a purpose need not be expressed; it may at times be reasonably inferred from all the circumstances attendant on the act." See Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519. Screws, supra, 325 U.S. at 106, 65 S.Ct. 1031, 89 L.Ed. 1495.
 Before the jury can make an inference from the circumstances, however, it is essential that it know the nature of the right, intentional violation of which it is asked to infer.
 
 
 [11]
 Our disposition of these cases makes it unnecessary for us to reach other claims of error raised by Appellants in seeking reversal